## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**KIMBERLY BRACEY**                                                                **PLAINTIFF**

**v.**                                             **CIVIL ACTION NO.: 3:25-CV-58-GHD-JMV**

**RUST COLLEGE; AND**
**MICHAEL HARPE, INDIVIDUALLY**                                    **DEFENDANT**

## SECOND AMENDED COMPLAINT
## JURY TRIAL DEMANDED

      **COMES NOW** Plaintiff, Kimberly Bracey, by and through counsel, Watson & Norris, PLLC, and files this action to recover damages for wrongful termination, the tort of tortious interference, and violation of the False Claims Act, against the Defendants, Rust College, and Michael Harpe, individually. In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

## THE PARTIES

      1.    Plaintiff, Kimberly Bracey, is a female resident of Shelby County, Tennessee.

      2.    Defendant, Rust College, may be served with process by serving Dr. Johnny M. Moore, President of Rust College, 150 Rust Avenue, Holly Springs, Mississippi 38635.

      3.    Defendant, Michael Harpe, Vice President for Student Engagement, may be served at 150 Rust Avenue, Holly Springs, Mississippi 38635.

## JURISDICTION AND VENUE

      4.    This Court has jurisdiction under the False Claims Act.

      5.    Venue is proper in this Court.

                                                                                                                         Exhibit "A"

**STATEMENT OF FACTS**

6. Plaintiff is a 48-year-old female resident of Cordova, Tennessee.

7. On January 9, 2023, Plaintiff was hired as the Project Director for Rust College's federally funded TRIO Upward Bound programs.

8. Plaintiff was later promoted to Executive Director of the Upward Bound Programs effective November 1, 2023.

9. In this role, Plaintiff oversaw three separate U.S. Department of Education TRIO grants: Upward Bound (Classic Program), Upward Bound Math Science 1 and Upward Bound Math Science 2.

10. These programs are designed to support high school students from low-income and first-generation college backgrounds in preparing for college entrance and success.

11. Plaintiff reported directly to Dr. Johnny Michael Harpe, Vice President for Student Engagement.

12. Plaintiff also reported to President Dr. Robert Dixon, who served as her second-line supervisor and who, at all relevant times, held authority over personnel decisions until his authority was rescinded in January 2025 by the Rust College Board of Trustees following his announcement that he would depart the presidency effective June 30, 2025.

13. As a federal grant program administrator, Plaintiff also engaged with members of the Rust College Board of Trustees, including Reverend Bob Ward, who serves as both a trustee and Chair of the Student Affairs Committee.

14. Throughout her tenure, Plaintiff worked to ensure full compliance with federal grant guidelines under the TRIO program.

15. The TRIO grant programs requires Rust College to reconcile the account for the grant monthly, which it regularly failed to do. The purpose of the reconciliation monthly is to make sure there are no over-draws, duplicate payments or mismatches between expenses and cash received.

16. When Rust College needed to receive money from the federal government for the TRIO grant, Rust College would request the money from the United States Department of Education ("DOE") by conducting a drawdown.

17. A drawdown is the request to draw money from the total designated monies awarded to Rust College in the TRIO grant.

18. For each drawdown Rust College is required to submit a certification to the DOE that Rust College is in compliance with the federal regulations and other requirements of the TRIO grant, which includes the requirement to reconcile the account for the grant monthly.

19. The certifying official for Rust College must affirm that "By submitting this payment request, I certify that the funds requested are for actual, allowable expenditures incurred, are accurate and complete, and are in compliance with applicable federal statutes and regulations."

20. When Rust College makes this certification as part of a drawdown the DOE processes the request and deposits funds electronically into Rust College's back account for the grant.

21. Funds must be used only to cover the expense that was identified to the DOE for justifying the drawdown, and any excess must be returned or offset in future drawdowns.

22. Rust College is required to first incur the cost of the program under the grant, and then it submits the drawdown to be reimbursed for those expenses that qualify under the TRIO grant.

23. Before any drawdown request is made to the DOE, Rust College is required by federal regulation and the grant to verify (1) the expense is allowable under the grant, (2) funds are available in the correct budge category, (3) the expense has already been incurred, and (4) it has documentation to support the charge.

24. On September 1, 2022, Rust College was given an authorization amount of $287,537 from the DOE that it could use as part of the TRIO program.

25. On September 1, 2023, Rust College was given an authorization amount of $299,038 from the DOE that it could use as part of the TRIO program.

26 On September 1, 2024, Rust College was given an authorization amount of $299,038 from the DOE that it could use as part of the TRIO program.

27. From September 30, 2022 until May 1, 2025, Rust College conducted numerous drawdowns.

28. For each drawdown Rust College falsely certified to the DOE that the funds requested are for actual, allowable expenditures incurred, are accurate and complete, and are in compliance with applicable federal statutes and regulations.

29. The certifications were false as Rust College was not reconciling its account every month, was using funds for reasons not approved by the DOE and was not refunding the DOE when the funds were not used for the reasons approved by the DOE.

29. Rust College would not have received these federal funds had it not continually falsified its certifications to the DOE for each drawdown.

30. Plaintiff discovered multiple discrepancies between the amounts reported as actual expenditures and the funds drawn from G5. For example, in September 2024, Rust College reported $41,857.30 in expenses but drew down $74,892.11—a difference of $39,256.19. Similar discrepancies occurred in October 2024 (+$25,693.12), January 2025 (+$28,532.10), February 2025 (+$35,900.68), and March 2025 (+$17,674.76). These overdraws were **certified to the DOE as funds used for allowable, incurred expenditures**, despite the absence of supporting documentation or actual expenses to justify them.

31. The repeated overdraws demonstrate a pattern of misrepresentation. Plaintiff also identified **repetitive creation, reversal, and re-entry of encumbrances** in internal accounting ledgers, which were used to justify drawdowns without reflecting actual expenditures. Such manipulations are inconsistent with **2 C.F.R. §§ 200.302, 200.303, 200.305(b), and 200.415**, which require accurate financial reporting, effective internal controls, and drawdowns only for allowable, incurred obligations.

32. Plaintiff later discovered that checks intended for student stipends were issued to CFO staff and other Rust College personnel not listed as authorized vendors or program personnel under the grants. These payments occurred from **April 2024 through May 2025** without Plaintiff's knowledge or approval. Plaintiff reasonably believed the checks were written as "CASH," meaning that funds had been withdrawn from the bank for in-person distribution to students.

33. Upon learning the extent of the unauthorized payments, Plaintiff reported the matter to Helen Seide, who is employed by Rust College as the DOE Program Officer. Following Plaintiff's report, the excess amounts were credited in G5. This demonstrates that the CFO and business office personnel were aware that these

payments were **improper and required correction** under federal oversight. By diverting funds to unauthorized personnel, failing to document transactions, and withholding bank deposit and withdrawal records, Rust College violated **2 C.F.R. §§ 200.303(a) and 200.302(b)(3)**, which mandate internal controls and accurate financial reporting, as well as the Project Director's authority under **34 C.F.R. § 75.701**.

34. The following table reflects documented discrepancies between reported expenses and amounts drawn down from the Department of Education's G5 system, as reflected in Business Office reports and drawdown records. These figures demonstrate a recurring pattern of drawdowns exceeding expenses, expenses exceeding drawdowns without reconciliation, and no documented credits or adjustments, inconsistent with federal requirements.

**Table 1: Expenses vs. G5 Drawdowns (GRANT P047M220643- September 2024–April 2025)**

| Month | Reported Expenses ($) | G5 Drawdown ($) | Difference ($) |
|---|---|---|---|
| September 2024 | 41,857.30 | 74,892.11 | +39,256.19 |
| October 2024 | 48,637.86 | 74,330.98 | +25,693.12 |
| November 2024 | 49,348.08 | 18,994.82 | −30,353.26 |
| December 2024 | 22,109.92 | 22,109.73 | −0.19 |
| January 2025 | 5,527.83 | 34,059.93 | +28,532.10 |

6

| Month | Reported Expenses ($) | G5 Drawdown ($) | Difference ($) |
|---|---|---|---|
| February 2025 | 8,080.39 | 43,981.07 | +35,900.68 |
| March 2025 | 17,563.22 | 35,237.98 | +17,674.76 |
| April 2025 | 9,090.38 | 8,767.83* | −322.55 |

*Additional drawdown of **$19,239.30** occurred on **May 1, 2025**, unsupported by April expenses.

35. The chart above compares reported expenses for GRANT P047M220643 with actual drawdowns from the G5 system for each month from September 2024 through April 2025. The differences between reported expenses and drawdowns reveal systematic discrepancies in the handling of federal funds:

36. **Drawdowns Exceeding Reported Expenses:** In multiple months— including September 2024 (+$39,256.19), October 2024 (+$25,693.12), January 2025 (+$28,532.10), February 2025 (+$35,900.68), and March 2025 (+$17,674.76)—funds were drawn down from G5 far in excess of the actual expenses incurred or reported. These overdraws indicate that federal funds were requested and certified as expended even though no corresponding costs had been documented, which is inconsistent with federal requirements under 2 C.F.R. § 200.302, § 200.303, and § 200.305(b).

37. **Drawdowns Below Reported Expenses:** In November 2024 (−$30,353.26), December 2024 (−$0.19), and April 2025 (−$322.55), reported expenses exceeded G5 drawdowns, indicating partial or delayed reimbursements, which further reflects a lack of accurate reconciliation between reported expenses and federal

7

drawdowns.

38. **Pattern of Misrepresentation:** The repeated overdraws demonstrate a pattern of misrepresenting the need for federal funds to the Department of Education. By certifying that funds drawn from G5 were for incurred and allowable expenses—when in fact the drawdowns often exceeded actual expenses—the Defendants provided false or misleading information to the federal government, which satisfies the standard for establishing prima facie evidence of fraud under federal grant regulations.

39. **Regulatory Violations:** These actions violate 2 C.F.R. § 200.302 (financial management), 2 C.F.R. § 200.303 (internal controls), 2 C.F.R. § 200.305(b) (drawing down federal funds only for incurred obligations), and 2 C.F.R. § 200.415 (allowable costs), as well as undermining the Project Director's authority under 34 C.F.R. § 75.701.

40. Rust College's CFO-provided reports to the DOE that included line items labeled **"Future Totals"**, which were incorporated into fiscal totals and treated as if they reduced available grant balances. Federal law prohibits drawing funds for anticipated or unincurred costs. See **2 C.F.R. § 200.305(b)**.

41. The inclusion of future costs—such as summer housing, summer personnel salaries, fringe benefits, and related indirect costs—explains how Defendants were able to justify drawdowns that substantially exceeded actual expenses and why grants appeared depleted months before summer programming began.

42. Rust College's use of umbrella accounts, rather than grant-specific accounting, further obscured the true source and allowability of expenditures and facilitated commingling and misallocation of federal funds.

43. Plaintiff further alleges that the Business Office repeatedly claimed requisitions were "lost" and required Plaintiff's office to recreate and resubmit identical

requisitions, resulting in duplicate entries and duplicate payments. These overpayments were not consistently refunded, and corresponding credits were not reflected in G5 drawdown records.

44. As a result, federal funds were drawn down or the original expense; and again for the duplicated or reissued payment, constituting double payment and inflated drawdowns without proper reconciliation.

45. As a result of the foregoing practices:

- **Grant P047A221567** was reported as **locked by May 2025**, despite entering the 2024–2025 year with **$158,151.47 in approved carryover totaling $457,189.47 available for program use during the 24-25 grant year (299,038.00 + 158,151.47)**;

- **Grant P047M220643** was reported as having **approximately $4,000 remaining by May 2025**, despite actual expenditures that do not support such depletion; however, **$457,189.47 should have shown as available for program use during the 24-25 grant year (299,038.00 + 161,151.47)**; and

- **Grant P047M220644** was reported as **fully depleted ($0 balance)** prior to the start of summer programming; however, $491,963.30 **in approved carryover should have shown as available available for program use during the 24-25 grant year (299,038+192,925.60)**

Each grant began the budget year with a **$299,038.00 annual award**, in addition to substantial carryover balances, making these end-states mathematically impossible absent improper drawdowns, unauthorized transfers, or false reporting.

46. Each drawdown submitted through G5 required Rust College to certify that funds were requested solely for **allowable, incurred, and properly documented**

9

**expenses**. See **2 C.F.R. §§ 200.302, 200.303, 200.305(b), and 200.415**.

By:

- Drawing funds for future costs,
- Failing to credit overpayments and duplicate payments,
- Transferring funds between accounts without Project Director approval, and
- Reporting expenditures inconsistent with actual expenses,

Defendants submitted **materially false or misleading certifications** to the U.S. Department of Education, resulting in the improper disbursement of federal funds.

47. The CFO-provided reports, monthly discrepancies, unauthorized budget transfers, missing approvals, duplicated expenses, and unsupported drawdowns collectively establish a **scheme to inflate expenditures, prematurely deplete grant balances, and falsely justify drawdowns from G5**, in violation of federal grant regulations and the False Claims Act, **31 U.S.C. § 3729**.

48. From April 2024 through May 2025, Plaintiff repeatedly reported to college leadership including President Robert M. Dixon, Human Resources Director Angela Williams, Title IX Director Venecca Green, and Defendant Michael Harpe that she suspected the Defendant Rust College was fraudulently misusing federal funds provided to the TRIO program.

49. Plaintiff disclosed that she found excessive and irregular drawdowns of federal funds that exceeded what was actually spent according to requisition records, improper personnel payments to employees that created double charges against expense accounts, conflicts of interest as to who received federal funds, altered financial documents to change expense reports and misrepresent costs, unauthorized changes and reallocations of funds between federal grant programs with the knowledge or

consent of Plaintiff or Dr. Harpe, and the use of improper payment methods.

50. Each one of these individuals knew that such fraudulent misuse of federal funds was a violation of the False Claims Act and have participated in federal grant approval processes where they have learned that such misuse is a violation of the False Claims Act. Likewise, these individuals knew that Plaintiff's complaints of this misuse of federal funds was a complaint for violation of the False Claims Act.

51. On April 30, 2025, Plaintiff submitted a formal memorandum to President Dixon, raising concerns about potential violations of federal grant regulations, specifically involving discrepancies in the college's use of federal TRIO funds.

52. On May 5, 2025, Plaintiff emailed Vice President for Student Engagement Dr. Johnny Michael Harpe, and wrote, "This memorandum serves to formally document my concerns regarding the misappropriation of funds within the TRIO Upward Bound programs. Specifically, I am informing and have informed you that after budget documents (i.e., requisitions, Budget Transfer Forms) documents were signed by both myself as the Project Director and you as the Vice President, witnessed by Upward Bound administrative staff, the Chief Financial Officer (CFO) made unauthorized changes and reallocations of funds between federal grant programs without our knowledge or consent.
As discussed, these actions raise serious concerns related to financial compliance, potential violations of federal grant regulations, and institutional accountability. I am taking the appropriate steps to file a formal complaint with Human Resources to ensure a full review and to protect the integrity of the Upward Bound programs."

53. On May 8, 2025, Plaintiff complained by e-mail to numerous of Defendant's management personnel that Defendant's actions under the TRIO program were

11

mispresenting an employee's function that would raise concerns regarding misappropriation of federal funds and false documentation to the United States Department of Education.

54. Defendant's management personnel that received this e-mail had the knowledge and understanding that such a complaint would be considered a complaint regarding violations of the False Claims Act.

55. Defendants have committed fraud by consistently misrepresenting to the United States through its applications and certifications for federal funds that it was in compliance with its requirements for use of federal funds that it received through federal grants.

56. On May 20, 2025, Plaintiff emailed Trustee and Chair of the Student Affairs Committee Reverend Bob Ward and wrote, "…The CFO [Phyllis Spragin] is now negotiating directly with parents of students who have already been accepted into highly selective programs, such as the Spelman College Summer STEM Program. She is misrepresenting TRIO's federal obligations by offering to pay for these opportunities from Rust College funds—outside the G5 federal system—and even suggesting the school will "match" payments for these internship experiences. This is not just improper—it is unlawful under TRIO guidelines. She has openly told staff the school will cover the summer program expenses but will not refund the G5 system. This misuse and redirection of federal funds will not only disqualify Rust College from receiving the Student Support Services(SSS) grant I recently wrote, but it will expose the institution to immediate audit risk across all federal programs—including financial aid…"

57. That same day Dr. Harpe sent a letter to Dr. Dixon recommending termination of Plaintiff and falsely claimed that Plaintiff had mismanaged federal funds.

12

58. Despite these good-faith whistleblower disclosures regarding financial improprieties, on May 22, 2025, Dr. Dixon sent a letter to Plaintiff that stated, "Thank you for your management of the Upward Bound Program at Rust College. I have determined that a change in leadership of the program is warranted. Accordingly, your tenure as Executive Director of the Upward Bound Program at Rust College ends at the close of business on May 29, 2025."

59. Plaintiff's termination occurred after her protected disclosures and without a formal performance review or investigation into her allegations.

60. Further, her termination occurred after Dr. Dixon's authority to hire and terminate personnel had been revoked, which raises significant concerns regarding retaliation, due process violations, breach of contract, and violations of the False Claims Act's anti-retaliation provisions.

## CAUSES OF ACTION

### COUNT I: WRONGFUL TERMINATION

43. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 42 above as if fully incorporated herein.

44. The acts of the Defendants described above constitute criminal fraud against the United States, which constitutes the tort of wrongful termination and entitles Plaintiff to damages.

### COUNT II: TORTIOUS INTERFERENCE

45. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 44 above as if fully incorporated herein.

46. By his actions Defendant Harpe tortuously interfered with the employment relationship and compensation structure between each Plaintiff and Defendant Rust

13

College. As such, Defendant Harpe's actions constitute tortious interference with employment.

## COUNT III: VIOLATION OF FALSE CLAIMS ACT

47. Plaintiffs re-alleges and incorporates all averments set forth in paragraphs 1 through 46 above as if fully incorporated herein.

48. Defendant Rust College has violated the False Claims Act by terminating Plaintiff in retaliation for reporting its violation of the False Claims Act, which violated the federal grants the Defendant had received from the federal government.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully prays that the Court cause service to issue in this cause upon the Defendant and that this matter be set for trial. Upon trial by jury thereon, Plaintiff prays that the following relief be granted:

1. Back wages;
2. Double back wages
3. Reinstatement or future pay in lieu of reinstatement;
4. Compensatory damages;
5. Attorney's fees;
6. Punitive damages
7. Lost benefits;
8. Pre-judgement and post-judgment interest;
9. Costs and expenses; and
10. Such further relief as is deemed just and proper.

THIS the ___th day of December 2025.

Respectfully submitted,

Kimberly Bracey, Plaintiff

By: /s Nick Norris
NICK NORRIS (MB# 101574)
Attorney for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC

14

272 Calhoun Station Parkway
Suite C #13
Gluckstadt, Mississippi 39110
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
nick@watsonnorris.com